Good morning and welcome to the 11th Circuit. Judge Branch and I are very pleased and honored to have joining us here today and tomorrow, Judge Higginbotham from the Fifth Circuit Court of Appeals. We thank him for his time and his efforts, and as I said, we're very happy to have him join us today. The first case that we have is United States of America v. Sams. Good morning. My name is David McGee. I'm from New York and I represent the appellant in this case. The case you have in front of you is a very unusual mail fraud case. It evolves out of a contract for the development of software in which the individual the government identifies as a victim, Mr. Asmar, received everything he contracted for. He testified that he was in fact thrilled with the product that was produced for him and that he thought the engineering team that put that product together was great. Those are his words. He took that product and he built a business with it. The business was a social app, communications between people, sort of like Facebook, same kind of thing where you get on and you talk to different people. He subsequently destroyed that business himself in order to prevent police from looking at the communications he had to see if he was communicating with children, with specifically a 12-year-old girl. The trial court concluded at the conclusion of this that Mr. Asmar had received everything he bargained for and that there was no loss attributed to Sam's because Mr. Asmar himself had destroyed the business. Despite the fact that Mr. Asmar received what he had bargained for, the government's position is that there was fraud. Their argument is that Mr. Asmar was deceived into getting into the contract and that deceit will go into in some detail, but essentially it's things like the name of one of the participants, one of the workers, Mr. Steiger. Mr. Steiger had for some years been using a different name, Robert Woods, and that name was used. But wasn't there really more than that? It seems to me like, to put it in the terms of Takalov, which it seems like this is somewhat similar to, well I don't mean the facts, but the actual description of when there's fraud. In Takalov, very sort of colloquially, the judge wrote, and we wrote on our panel, that if you're paying for Pappy Van Winkle, then you shouldn't be given Old Crow, right? Absolutely. All right, and it seems like that's what happened here because it seems like what Asmar was paying to get the professional services of some elite programming squad with 50 programmers, and instead what he got was cut rate contractors, and as a result, there were certain problems with the program, such as there were bugs, it would shut down, there were other kinds of issues with the program. Why is this not like what was described in Takalov? Let me talk about Takalov for just a second. Yes, Takalov says two things of significance in this case. It says, first of all, that for there to be fraud, that deception is not fraud unless it goes to one of the essential elements of the bargain, okay? That's one thing. The second thing it says is, even though you deceive someone into getting into a contract, okay, if they get everything they bargained for, all right, that's not fraud. That's the two holdings of Takalov. In fact, I think if Takalov is, in fact, good law, we win in this case because their argument is essentially that he was deceived into- I assure you Takalov is good law in this circuit. Okay. If Takalov is good law, their argument at best is that he deceived them, he deceived, Mr. Sams deceived Mr. Asmar into getting into a contract in which Mr. Asmar got everything he bargained for. Now, you mentioned a couple of things. You said, well, he was going to get 50 engineers working on this. That's wrong. And I know that comes from the judge's rule 29 order. It's factually incorrect. What you'll find is the 50 engineers is allegedly a statement that Mr. Asmar's brother says was made to him sometime after the initial contract had been signed by Mr. Steiger. And Mr. Steiger said, we've got 50 engineers working on this, okay? That was never said to Mr. Asmar, and there is no testimony that it was told to Mr. Asmar. Let me ask you a question though. Yes, ma'am. If, in fact, Mr. Asmar got everything he paid for, why didn't your client just tell him in the beginning, I'm going to contract this out to a bunch of independent contractors and then charge him the same thing that he otherwise charged? You've got to read the contracts to see what the deal is in this case, all right? Let me go back to what the essential elements are. The essential elements are contained in writing in the two contracts. There's a contract, Exhibit 34, Government's Exhibit 34, which is the February 8th contract in which he got into that. It says exactly what Mr. Sam's company is supposed to do for Mr. Asmar. There's another contract where Mr. Asmar did not pay for the initial contract. They reformulated the contract to the April 6th contract, and the April 6th contract is the operative contract in this case. It is conceptually very simple. It says, we will develop for you software, which if you pay us, we will license to you. Mr. Asmar never paid for the software. He had no right to the software. You mentioned earlier that, well, it didn't work. That is wrong, and if you read page 8 of the contract... Let me just ask you, are you disagreeing that there were any bugs at all in the software, and are you disagreeing that there were problems with it? The answer to that is more complicated than yes or no. You've got to read page 8 of the contract. Page 8 of the contract says, we don't guarantee that there will be no bugs in this contract. What we say is, if you find a bug in the contract, you contact us and we'll work it for a fee. All right? Now, Mr. Asmar agreed to pay for the maintenance of the app, of the software. He stopped paying in July the 12th of 2012. But again, I'm sorry, but again, if what he was buying was just the app, and that's it, and not services by a particular company that he thought was some very sophisticated engineering company, then why did your client not just tell him, I'll put the app together for you, we'll do the engineering for you, and the coding, this is what it's going to cost you, and that would be the end of it. Why was it necessary? That was the deal. What happened in the deal was Mr. Steiger and Mr. Sams were going to do the work in the deal. Mr. Steiger, in the initial contract, was to be the lead programmer. Okay? Mr. Steiger, within days of entering into the contract decides that he wants to go back to Europe for a month because he is, one of his hobbies is hot air ballooning, and he wants to hot air balloon over the Alps, and you can only do it at a certain time. Mr. Sams, at this time, has already hired engineers to do the contract. He is paying money out already. So, and here's where he deceives you. Okay? He says, instead of telling him that Steiger's going to fly a balloon, Mr. Sams takes over and does the work himself. Okay? That's, when the contract is signed, Steiger's supposed to do the work, Steiger backs out, and Steiger was going to come back and do it, but Asmar wanted it done now. In order to get it done now, Sams jumps in, fills in for what he's thrilled with the work that Mr. Sams does. So, when you can talk about the maintenance, look at page eight of the contract. Page eight of the contract says- Can I just ask you, though, what does Woods Security Group and Robert Woods have to do with this? That's the contracting entity. Right. And did it exist? Yes, ma'am, it does, and the testimony is specifically- And did it program, and did it do the programming, and was it what was promised as far as Woods Security Group goes? Yes, ma'am, it did. It did the work. WSG, Woods Security Group, is a DBA of Sprout Marketplace. The government put on evidence that Woods Security Group did not have an independent building. Okay? But they're a DBA of Sprout Marketplace, and Mr. Steiger's testimony, who was a government witness, is that Sprout Marketplace was a cutting-edge technology firm out of Palo Alto, California, that did all kinds of cutting-edge work. Woods Security Group is a DBA of Sprout Marketplace. They were perfectly capable of doing the work. When the government in its indictment and- Why is that not a jury question as to whether or not they actually did the work? I mean, the whole question here is whether that was fraudulent. Whether, in fact, they did the work, whether they were this premier software engineering company, I mean, that's what the issue is here. Read the contracts, the bargain. The bargain does not say they are a premier firm. The truth is, though, that both Mr. Sams and Mr. Steiger are eminently qualified to do the work. The government says in the indictment they're not qualified. They put on no evidence whatsoever that they were not qualified. The evidence in the trial is that they are eminently qualified. Mr. Steiger had previously led an engineering team, a large engineering team, in a complex project that took a matter of years and created a very complex software engineering product for which he was awarded a patent. The patent is in evidence. There is no evidence to the contrary. Mr. Sams was described as a bright, talented software engineer who had done cutting-edge work in social media software previously. But what about Robert Woods? Robert Woods is Steiger. Mr. Steiger, for reasons that are never fully explained by anybody, and including Mr. Steiger, used the name Robert Woods for several years prior to this. He continued to use the name Robert Woods. I suspect it's because he has not paid his taxes in 30 years, which is part of his testimony. He had not paid taxes for 30 years. He used the name Robert Woods on and off. But the true name of the person doing the work is not an essential element of the contract. Maybe the... Isn't that what brings people to the table? If, again, back to the Pappy analogy, that you might get the app you contracted for, but the reason you're even in the room negotiating with people is because of what they're representing themselves to be, and that's why you're willing to pay money, and that's why you enter into the contract. So if there's deception as to who is performing these services, why is that not material? Let me talk about the deception. Two reasons. First of all, that deception is, to the extent that it is deception at all, and I contend that it is not, that deception is to lure you into the contract. You then look at what you're going to get in the contract, and under Tackle-Off, if you get everything that bargain says, and it's in writing, and he admits that he fraud. The deception is... I don't think there is deception. What he tells, other than the name, Mr. Steiger's name is not Robert Woods, it's Henry Steiger. But the name of the guy doing the work is not an essential element of the contract. What he tells them, he describes Steiger's work, his history, and he describes it as Robert Woods. Steiger comes in and testifies for the government and says, everything he says about me is true. I have done all those things. So he doesn't mislead him as to Steiger's qualifications. He doesn't mislead him as to his qualifications. There is nothing in the contract that says this has to be a big California firm. The truth is, it's a DBA of a California cutting-edge technology firm, Sprout Marketplace. Thank you, Mr. McGee. You've saved three minutes for rebuttal. Thank you. Good morning. May it please the court, Robert Davies for the United States. Unless the court prefers otherwise, I'd like to go to my second argument first, which is that even if all the language in Tackle-Off is a holding, there was sufficient evidence to convict for the four reasons in my brief as to counts one through five, and the fifth reason as to count six through seven. First, a reasonable jury could find the defendant guilty because of his misrepresentations and lies about Robert Woods and Robert Woods' firm's qualifications. And Judge Fenton ruled on that in his order denying the motion for judgment of equivalent pages 20 and 21 of the order. And I adopt that in full. I mean, that is why you should affirm the district court bottom line. Judge Fenton found that the lies were capable of influencing Asmere's assessment of the value of the bargain to him. Mr. McGee mentioned that the 50-engineer was to Asmere's brother, and it was, but there's plenty of other evidence which is cited in Judge Fenton's order and at pages three to seven of my brief. At document 183, page 150, Asmere testified about the defendant telling him he had found an engineer that was interested in the product, in the project. It was Robert Woods, Woods Security Group. They were a great company. They were as good as Facebook. They were located in California. He also, the defendant also said the co-founder, Robert Woods, would quit his job and work eight weeks solid on your project alone. There's the quote in my brief from Government Exhibit 25C-7 about Robert's background being incredibly varied and how great he was. So Judge Fenton's order at pages 20 and 21 was correct. Mr. McGee mentioned the contracts, but the point is the defendant fraudulently induced Asmere to evidence that Asmere was happy with it, but as I cited in my brief, there was testimony that the app did not work and that there were bugs in it. And again, this is important, taking the evidence in the light most favorable of the government for all the reasons at pages three and eight of my brief. And if it wasn't important, why did, why did the defendant keep lying? That's something the jury could consider. Judge Rosenblum, you ask about Woods Security Group and whether it exists, taking the evidence in the light most favorable to the government, it doesn't. No question there's evidence in the record that it exists, but there's evidence in the record that it doesn't. What exists is a corporation called Sprout Marketplace, Inc. Harry Steger went to the bank and said, I want to open a bank account in the name of Sprout Marketplace, Inc., doing business as Wood Security Group. That doesn't create this corporation. It doesn't exist. Same with Wood Security, same with WSG, Inc. That's a corporation, but it's formed by Robert Woods. Robert Woods doesn't exist. You get to count six and seven, Web Factory Software Group. That doesn't exist either. So taking the evidence in the light most favorable to the government, Judge Benson's correct and you should affirm him. On this first argument, I do want to mention that in his reply brief, the defendant argues the indictment was insufficient because it didn't allege that the lies were capable of influencing Asimov's assessment of the value of the bargain. You should reject that argument for several reasons. Most notably, it wasn't raised in the defendant's initial brief and he's on notice of the need to raise it from Judge Benson's order, pages 20 to 21. Also, it is in our indictment. If you look at section, count one, section C, paragraphs five through 13, and count one's realleged and reincorporated in the other counts. The same is true in his reply brief. He argues some about jury instructions. That wasn't raised in the initial brief. That's waived. I have sites which I didn't have to get a chance to get, but I think the court is well aware of its law in this area that raising an argument in the reply brief is too late. That makes it waived. There's a second argument that I don't want to get lost in the shuffle as to why you should affirm Judge Benson, and that's that defendant defrauded Azmir out of money for supposed $17,000 a month maintenance payments that did not occur. Mr. McGee in his brief and reply brief says there's no evidence of that, but there is evidence of that. If you look at government exhibit S10, it shows no payments of $34,000 or $17,000. The highest payments are under $4,000 and the total is under $78,000. Also, page 16 and 17 of my brief, the Wood Security, WSG, Inc. bank account, no payments like that. Special Agent Kennard testified and the sites are at page 16 of my brief. He looked at personal accounts. There were no payments of that type. At page 19 of his reply brief, Mr. McGee said, well, there was evidence that the defendant paid some money out of his pocket, but if you look at his citations, which he cites trial day five, it's actually trial day seven, document 181, pages 157, 164, 175, and 76. All that shows is that the defendant personally paid $12,240 for the South by Southwest event. That's got nothing to do with maintenance payments, and even if you add it to the $78,000, you're still at $90,000. You have my third argument that the app did not work, which there was evidence of. I would also point out that the defendant testified he did maintenance for a year for no charge. That's at document 186, pages 110 to 112. If that's true, the app wasn't functional. If it's false, when I submit it was, that supports the government's argument and the jury's finding that the defendant was not paying for maintenance, and him inducing asthma to do so was a fraud. What about the issue that has been mentioned, certainly in the briefing, that the app went offline, that Mr. Asmar deleted the app data from the server? How does that figure in? It doesn't. Mr. Asmar deleted the app on or about July 1st, 2013. That doesn't foreclose a verdict that before then there was a scheme to defraud him between the defendant and Steger, which was in 2012. Before July of 2013, there was a scheme to defraud between the defendant and Turner, which was in May of 2013. You have my fourth argument as well, which is that the defendant diverted money met for Wood Security Group 8, which don't exist to his own use. Then you have Counts 6 and 7, which are really independent. I mean, don't let them fall through the cracks. You've got, on top of all the arguments I've made about that, overall, you've got the defendant, who is the consultant, advising Asmar to hire a company that secretly is the defendant and a consultant. A reasonable jury could find that this was fraud. Taking all the evidence in the light most favorable to the government, as this Court is required to do, there was sufficient evidence to convict, and you should affirm the is dicta. As Judge Fenton, the language at issue in Taklov is dicta. I think the holding Judge Fenton addresses at page 8 of his order is that there's got to be deceit and there's got to be fraud, intent to harm. But this language about the victim didn't get exactly what he paid for is dicta. I think Judge Fenton expects- I'm not sure it's dicta, but I'm not sure I understand it the way that both of you seem to understand it. To me, that language is saying, if he got exactly what he asked for, in the sense of he knew he was asking, in Taklov, he knew he was asking to buy a woman a drink, and he got to buy a woman a drink. That's exactly what he asked for, and he got to do that. In this case, Asmar is asking for professional and elite engineering services, and it doesn't seem to me like the jury found that that's what he got. So to me, I don't think he got exactly what he asked for. I don't see that as dicta. I just don't- Okay. I mean, you don't need to answer that here, and Judge Fenton said that in his order at pages 20 to 21, what you just said, and that is the government's position. I mean, if every ward in Taklov is a holding, which you should still affirm for the four reasons I've given in my brief is to counts 1 through 5, and the fifth reason is to count 6 through 7, which I've discussed here today. So taking the evidence in the light most favorable to the government, this court should affirm the district court's denial of the motion for judgment of acquittal. Thank you, Mr. Davies. Mr. McGee. Judge Fenton's order was on the Rule 29 motion, and it does lay out some facts that the judge thought at the time was correct. If you will read the sentencing in this case, a month later, the judge at that time had access to the transcript, and we cited the transcript frequently in our motions at sentencing. The transcript is very different than the conclusions that Judge Fenton drew in his Rule 29. For example, at page 17 of his order, he says that he was misled as to the qualifications of the people doing the work. He was not. And there is no testimony whatsoever from the government as to the qualifications, negative as to the qualifications of Mr. Sams or Mr. Steiger. The only testimony as to qualifications is that they are eminently qualified. The judge got that factually wrong as to their experience. There is nothing in there that is, there is no evidence that they were, that Mr. Asmar was misled as to their experience. None. Zip. Zero. In fact, the description that Mr. Sams gave of Mr. Steiger's experience, Mr. Steiger confirmed when he testified for the government. As to the facilities, there is nothing in the contract that says anything about the facilities. That's not a part of the contract. As to financial resources, there is no representation whatsoever as to the financial resources of the company doing the work. To the extent that there is any deception, for example, Mr. Steiger's name, it is deception to get them into a contract. It is not a deception about what he will get from that contract because he got exactly what he wanted from the contract. Mr., you, this is a case where the evidence was thrown against the wall. But let me ask you something. If he had just said what the facts were, I mean, why didn't he just say what the facts were if he wanted to get him into the contract? I mean, isn't there a reason why he didn't do that? And the reason is, it seems like the reason is. The only thing he says, I mean, go back and read the communications. First of all, he says, I don't want to do the work for you. That's what he tells Mr. Asmar because he thought Mr. Asmar was a flake and he didn't want to do the work. Mr. Asmar continues to persist and Mr. Sams eventually agrees to do it. So tell me what it is he told him that was wrong. Find it in the record because it's not in there. What about count six and seven and the deception? Turner, count six and seven. Gets frustrated and he gets Mr. Turner to help him. He gets frustrated because Mr. Asmar will not pay. He keeps saying he's going to pay, but he doesn't pay. Mr. Turner gets involved. Mr. Turner calls Mr. Asmar and talks to him and confirms that from Mr. Asmar's own words that he owes the money. Mr. Asmar tells Mr. Turner, yes, I owe the money and I'm going to pay the money. Well, Mr. Turner thought he was being played. He thought the guy wasn't telling the truth. So he wanted to see, this is his testimony, he was a government witness. He wanted to see if the guy really had the money. So he says, I'll tell you what, they made an offer to him to purchase the company contingent on his paying his debts. Okay. Within days, that offer is withdrawn. But Mr. Turner and Mr. Sams both believed that the money was owed. The contract says it's owed. Turner looked at the contract. The contract says, yes, you owe money for this work. Mr. Asmar told Mr. Turner, yes, I owe the money and I will pay the money. It is not a crime to lie to a deadbeat to get money he legitimately owes. And that's what happened in this case. Thank you. Thank you, Mr. Yate. Thank you. All right, next up we